## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROL TREIBER, LESLIE TALMAN, LORI SLAUTER, RODNEY HERRING, PATRICIA HUDDLESTON, CARL DORSEY, IRENE EVERS, KATHRYN HOVLAND, ISABELLE REALI, GERALDINE LANGFORD, and TROY FULWOOD, On Behalf of Themselves and All Others Similarly Situated, | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | 3:12-CV-1565[DNH/ATB] |
| -against- | |
| ASPEN DENTAL MANAGEMENT, INC., ROBERT A. FONTANA, and LEONARD GREEN & PARTNERS, L.P., | |
| Defendants. | |

Plaintiffs Carol Treiber, Leslie Talman, Lori Slauter, Rodney Herring, Patricia Huddleston, Carl Dorsey, Irene Evers, Kathryn Hovland, Isabelle Reali, Geraldine Langford, and Troy Fulwood by their undersigned attorneys, bring this class action complaint against defendants Aspen Dental Management, Inc., Robert A. Fontana, and Leonard Green & Partners, L.P (collectively, "Defendants"). Plaintiffs' allegations are based upon knowledge as to their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, an extensive investigation undertaken by their attorneys.

### NATURE OF THE ACTION

1. This is a class action against Aspen Dental Management, Inc. ("ADMI") for violations of New York General Business Law §§ 349, 350 ("GBL"), breach of

implied covenant of good faith and fair dealing, and unjust enrichment.  Plaintiffs and the members of the Classes they seek to represent are all current and former consumers of dental services and products at ADMI dental clinics who were misled by ADMI's unfair and deceptive trade practices.

2.      As alleged herein, through ADMI's corporate structure and business model, ADMI engages in the unlawful corporate practice of medicine, and in doing so, induces consumers into purchasing dental services and products.

3.      Plaintiffs, on behalf of themselves and on behalf of a class and subclass of similarly situated individuals, seek to obtain injunctive relief and/or recover compensatory damages in the amount of all treatments purchased due to ADMI's unlawful conduct alleged herein.

4.      In terms of injunctive relief, Plaintiffs seek, *inter alia*, an order directing: (a) cessation of the wrongful and deceptive practices; (b) implementation of administrative changes designed to remedy current and future problems; and (c) improved disclosure to ADMI consumers.

## JURISDICTION AND VENUE

5.      This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 ("CAFA"), which, *inter alia*, amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are more that 100 or more members in the proposed class and subclass; (b) at least some members of the proposed class and subclass have a different citizenship from ADMI; and (c) the claims of the

proposed members of the subclass exceed the sum or value of five million dollars ($5,000,000) in the aggregate. *See* 29 U.S.C. § 1332(d)(2) and (6).

6.    This Court has personal jurisdiction over the Plaintiffs because they submit to the jurisdiction of this Court.

7.    This Court has personal jurisdiction over Defendant Aspen Dental Management, Inc. ("ADMI") because ADMI is headquartered in the State of New York, transacts business within the State of New York, and by virtue of the fact that ADMI's executive offices are located in the State, ADMI continually and systematically conducts business throughout this State.

8.    This Court has personal jurisdiction over Defendant Leonard Green & Partners, L.P. ("LGP") by virtue of its majority ownership of Defendant ADMI, which transacts business and maintains its headquarters and executive offices in the State of New York.

9.    This Court has personal jurisdiction over Defendant Robert A. Fontana ("CEO Fontana") because CEO Fontana resides in the State of New York and is the President and Chief Executive Officer of Defendant ADMI, which transacts business and maintains its headquarters and executive offices in the State of New York.

10.    Venue is proper because ADMI is headquartered in this District, conducts substantial business in this District, maintains offices in this District, and because certain of the acts or omissions affecting Plaintiffs and members of the proposed class and subclass occurred in this District.

## PARTIES

11.     Plaintiff Carol Treiber ("Treiber") is an individual residing in Morris, New York.  In April 2011, Treiber became a patient at an ADMI clinic in New Hartford, New York.

12.     Plaintiff Leslie Talman ("Talman") is an individual residing in West Haven, Connecticut.  In December 2010, Talman became a patient at an ADMI clinic in Orange, Connecticut.

13.     Plaintiff Lori Slauter ("Slauter") is an individual residing in Altoona, Pennsylvania.  In June 2010, Slauter became a patient at an ADMI clinic in Altoona, Pennsylvania.

14.     Plaintiff Rodney Herring ("Herring") is an individual residing in Bourbonnais, Illinois.  In September 2010, Herring became a patient at an ADMI clinic in Bourbonnais, Illinois.

15.     Plaintiff Patricia Huddleston ("Huddleston") is an individual residing in Rhodes, Michigan.  In August 2010, Huddleston became a patient at an ADMI clinic in Bay City, Michigan.

16.     Plaintiff Carl Dorsey ("Dorsey") is an individual residing in Swansea, Massachusetts.  In April 2011, Dorsey became a patient at an ADMI clinic in Seekonk, Massachusetts.

17.     Plaintiff Irene Evers ("Evers") is an individual residing in North Judson, Indiana.  In September 2011, Evers became a patient at an ADMI clinic in Valparaiso, Indiana.

18.     Plaintiff Kathryn Hovland ("Hovland") is an individual residing in Milwaukee, Wisconsin.  In March 2011, Hovland became a patient at an ADMI clinic in Brookfield, Wisconsin.

19.     Plaintiff Isabelle Reali ("Reali") is an individual residing in South Portland, Maine.   In July 2010, Reali became a patient at an ADMI clinic in South Portland, Maine.

20.     Plaintiff Geraldine Langford ("Langford") is an individual residing in Paducah, Kentucky.  In December 2010, Langford became a patient at an ADMI clinic in Paducah, Kentucky.

21.     Plaintiff Troy Fulwood ("Fulwood") is an individual residing in Fort Myers, Florida.  In October 2009, Fulwood became a patient at an ADMI clinic in Fort Myers – Cypress Woods, Florida.

22.     Defendant ADMI is a Delaware general business corporation with its principal executive offices located at 281 Sanders Creek Parkway, East Syracuse, New York, 13057.  It is registered with the New York State Department of State, Division of Corporations, as a foreign business corporation – DOS ID # 2357912.

23.     Defendant CEO Fontana is the President and Chief Executive Officer, and the Chairman of the Board of Directors, of ADMI.

24.     Defendant LGP is the majority owner of ADMI.

        a.   According to its website, LGP is "one of the nation's preeminent private equity firms with over $14 billion of committed capital" that invests "in established companies that are leaders in their markets."

b.  LGP's offices are located at 11111 Santa Monica Boulevard, Los Angeles, California, 90025.

c.  Three (3) of LGP's "Firm Professionals" currently serve on ADMI's Board of Directors: (i) Managing Partner Peter J. Nolan; (ii) Partner John M. Baumer; and (iii) Principal Alyse M. Wagner.

## CLASS ACTION ALLEGATIONS

25.  Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) and (b)(3) on behalf of themselves and the following class and subclass (collectively "Classes" unless specified):

(a)  All persons who are or may be harmed by ADMI's illegal corporate practice of medicine by virtue of being paying recipients of ADMI dental services and products (the "Class"); and

(b)  All persons who were harmed by ADMI's illegal corporate practice of medicine after paying for ADMI dental services and/or products (the "Subclass").

26.  The Class Period is defined as the time period applicable under the claims to be certified.

27.  Excluded from the Classes are Defendants, their assigns, and successors, legal representatives, and any entity in which Defendants have a controlling interest.

28.  Plaintiffs reserve the right to revise these class definitions and to add subclasses as appropriate based on facts learned as the litigation progresses.

29.  Plaintiffs Carol Treiber, Leslie Talman, Lori Slauter, Rodney Herring, Patricia Huddleston, Carl Dorsey, Irene Evers, Kathryn Hovland, Isabelle Reali, Geraldine Langford, and Troy Fulwood, by virtue of their experiences and damages suffered as ADMI consumers, are representative of the proposed Classes, comprised of

all similarly situated individuals who, in their capacity as ADMI consumers entering into transactions throughout each of the states in which ADMI operates, were subjected to, *inter alia*, the unlawful corporate practice of medicine causing violations of New York General Business Law §§ 349, 350.

30. This action is properly maintainable as a class action.

31. The Classes are so numerous that joinder of all members is impracticable.

32. To the extent required, the number and identity of class members can easily be determined from the records maintained by ADMI and/or its agents. The disposition of their claims in a class action will be of benefit to the parties and to the Court.

33. A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted, and no unusual difficulties are likely to be encountered in the management of this action as a class action. The likelihood of individual class members prosecuting separate claims is remote.

34. There is a well-defined community of interest in the questions of law and fact involved affecting Plaintiffs and members of the Classes.

35. Among the questions of law and fact which are common to members of the Class (*i.e.*, 23(b)(2)) are the following:

      a. Whether ADMI maintains clinics that are, at all relevant times, fraudulently incorporated and owned, operated, and controlled by Defendants;

    b.   Whether ADMI maintains clinics that are, at all relevant times, nominally "owned" by sham owner-dentists who do not engage in the practice of dentistry through the professional corporations they formed;

    c.   Whether ADMI maintains clinics that are, at all relevant times, engaged in unlawful fee-splitting with non-dentists; and

    d.   Whether ADMI's illegal corporate practice of medicine has or will cause harm to consumers.

36.    Among the questions of law and fact which are common to members of the Subclass (*i.e.*, 23(b)(3)) are the following:

    a.   Whether ADMI violated GBL §§ 349, 350 by engaging in the unlawful corporate practice of medicine;

    b.   Whether ADMI breached common law covenants with Plaintiffs and all others similarly situated by, *inter alia*, and engaging in the unlawful corporate practice of medicine; and

    c.   Whether, and to what extent, Plaintiffs and members of the Subclass have been damaged by ADMI's misconduct and the proper measure of damages.

37.    Plaintiffs are members of the Classes and are committed to prosecuting this action. Plaintiffs have retained competent counsel experienced in litigation of this nature.

38.    Plaintiffs' claims are typical of the claims of other members of the Classes in that they are seeking to change ADMI's corporate practices and/or seeking compensatory damages for ADMI's conduct as alleged herein, the same claims being

8

asserted on behalf of each individual class member.  Plaintiffs are, therefore, adequate representatives of the Classes as described herein.

39.     The likelihood of individual class members prosecuting separate individual actions is remote due to the relatively small loss suffered by each class member as compared to the burden and expense of prosecuting litigation of this nature and magnitude.  Absent a class action, ADMI is likely to avoid liability for its wrongdoing, and the members of the Classes are unlikely to obtain redress for the wrongs alleged herein.

40.     Adjudication of this case on a class-wide basis is manageable by this Court.  The contracts that were entered into by Plaintiffs and each class member are the same or so similar as to be legally and factually indistinguishable in all material respects.  As a result, it will not be difficult for a jury to determine whether ADMI committed the violations alleged herein.  This court is an appropriate forum for this dispute.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

41.     As described above, ADMI holds itself out as a dental service corporation providing integrated business support services to dental care providers throughout the United States.

42.     In the State of New York, ADMI maintains its corporate headquarters, a Practice Support Center, 41 dental clinics, and a denture manufacturing facility.

43.     As of the date of this filing, ADMI maintains 358 dental clinics throughout the United States, with locations in 22 states: Arizona (7), Connecticut (17), Florida (28), Illinois (16), Indiana (29), Iowa (15), Kentucky (9), Maine (7), Massachusetts (27), Michigan (18), Nebraska (4), New Hampshire (9), New York (41),

Ohio (42), Oregon (6), Pennsylvania (36), Rhode Island (3), South Carolina (7), Tennessee (14), Vermont (1), Washington (4), and Wisconsin (18).[1]

44.    According to ADMI, in 2011, ADMI practices recorded more than 2.2 million patient visits, including visits from more that 490,000 new patients.

45.    ADMI purports to "allow[] dentists to focus on providing great clinical care to their patients, with the support of a team of experts who offer back-end business and administrative support," including "training and professional development, benefits administration, marketing and advertising, insurance processing, procurement, facilities and equipment."  According to ADMI, "[f]or the dentist, joining Aspen Dental means that he or she no longer has to wear multiple hats – serving as HR director, IT professional, payroll clerk, benefits administrator and accountant, to name a few – but rather can focus on patient care and leading their office team."

46.    According to CEO Fontana, who is not a dentist and has no background in dentistry, "the business services [ADMI] offer[s] dentists enable[s] them to focus on patient care and relieve them from the everyday business requirements of the practice."

47.    ADMI is the "800-pound gorilla" in an industry known as "Corporate Dentistry" – an emerging business model in which a corporation runs the business side of a practice and hires licensed dentists as employees and independent contractors.  This model tends to attract young and inexperienced dentists fresh out of dental school, particularly ones with exorbitant student loans who are baited into joining ADMI by lucrative compensation packages, which include production-based incentive bonuses; they are new to the practice of dentistry and not familiar with the corporate practice structure.

---

[1] Aspen Dental, *Find a Location*, *available at* http://www.aspendental.com/locations.

48.     On the patient side, ADMI's target market has been described by CEO Fontana as consisting of patients who "do not have a regular pattern of dental care and sometimes have gone years without visiting the dentist."  According to CEO Fontana:

> "Ultimately, [our] growth is driven by the fact that Aspen Dental practices meet a significant unmet need in the marketplace …. While we see patients from all economic walks of life, our focus is to help the increasing number of families struggling to make ends meet.  These families are making tough financial choices every day or living paycheck to paycheck and to them, dental care can become somewhat discretionary or 'nice-to-have' as opposed to 'must have.'"

49.     CEO Fontana has also stated: "[I]n communities with an aging population, access to dental care can be a true challenge.  Because Aspen-served practices are conveniently located, work with most private insurance plans, are open all weekdays and select evenings and Saturdays, and charge affordable fees, they are an attractive option for patients."

50.     Not surprisingly, ADMI places its Local Offices primarily in low-income areas and targets blue-collar workers and unwitting consumers who are unfamiliar with proper dental care.  ADMI's business model has forced many consumers into debt and has led to complaints of, *inter alia*, patients being overcharged and billed for dental services and/or products that they did not receive and/or authorize.

### A.     A Brief History of ADMI and the Influence of Private Equity

51.     "Private Equity," as defined by Investopedia.com, "consists of investors and funds that make investments directly into private companies ….  Capital for private equity is raised from retail and institutional investors, and can be used to fund new technologies, expand working capital within an owned company, make acqusitions, or to strengthen a balance sheet."  As further explained: "Many private equity firms conduct

what are known as leveraged buyouts (LBOs), where large amounts of debt are issued to fund a large purchase.  Private equity firms will then try to improve the financial results and prospects of the company in the hope of reselling the company to another firm or cashing out via an IPO."[2]

52.     In 1964, Upstate Dental began providing dental laboratory services to the Syracuse, New York community.  In 1981, Upstate Dental merged its laboratory services with centralized management services to create a new dental practice management concept.

53.     In 1997, a group led by APG Partners private equity investor Andy Graham ("Graham") formed Upstate Dental Management, LLC and acquired the assets of Upstate Family Denture Services, Inc., Upstate Denture Labs, Inc., and East Coast Dental Management, Inc.   The entities were then merged and re-named "Aspen Dental Management, Inc.," offering dental practice management services to various dental offices in the northeast.

54.     On its website, APG Partners describes its investment in ADMI as follows:

**Thesis**

The founder of Upstate Dental had created an unusual business model, combining practice management with in-house lab services, focused on serving "non-compliant" patients.  APG perceived the business model as unique and addressing an unmet need.  By upgrading and scaling the operations, APG believed the company had the opportunity to become the dominant dental service provider in its region.

**Outcome**

By 2006, Aspen Dental was considered one of the largest and most successful dental practice management businesses in the country.  The

---

[2] *See* http://www.investopedia.com/terms/p/privateequity.asp#axzz23j7m20Si.

company had developed a high quality leadership team, a proven model for providing valuable practice management services and a comprehensive set of unique long-term incentive programs. Executing a steady growth strategy, the company's value grew appreciably over an eight-year period. In 2006, the company was sold to Ares Management.

55. Graham is currently the CEO of private investment firm Intrepid Investment Partners LLC ("Intrepid"). According to the Intrepid website, Graham "has over 25 years of diversified experience in the financial services industry, including 20 years as a private-equity investor." Prior to Intrepid, Graham was the founder of APG, Managing Director of Barrington Associates, founder of the Merchant Banking Department of Tucker, Anthony, Managing Director of Cariad Capital, Inc., and Vice President of Narragansett Capital. Graham has an M.B.A. and, in addition to ADMI, has also served as a director of the Oregon Ice Cream Company, Glasstech, and Comsec/Narragansett Security.

56. According to a testimonial by ADMI CEO Robert A. Fontana, Graham, who is not a dentist and has no medical or dental background whatsoever:

> was a major shareholder of Aspen and served as Chairman for nine years. During this time, Aspen experienced significant growth and change. [Graham] *was an active partner in all major decisions, helping to establish many of the foundations of the Company's growth strategy*, and was a valuable contributor to our long term success.

57. During Graham's tenure, ADMI grew rapidly. In 1999, ADMI expanded to 25 locations. In 2000, ADMI expanded to 33 locations. In 2001, ADMI expanded to 37 locations, opened its central processing facility in Syracuse, and branded its proprietary line of full and partial dentures – Comfidents. In 2002, ADMI expanded to 41 locations, including its first in New Hampshire. In 2003, ADMI expanded to 50 locations, including its first in Pennsylvania.

58.     In February 2004, Capital Resources Partners ("CRP"), which describes itself as "an experienced provider of debt and equity capital to lower middle market companies" that "manages in excess of $1.1 billion across five funds," invested $18.7 million in ADMI, in the form of both senior and junior secured subordinated notes with a warrant for common stock, which was used to complete a recapitalization of ADMI's then-existing investors and to provide capital for the opening of new offices.

59.     In 2004, ADMI expanded to 62 locations, and in 2005, ADMI expanded to 80 locations, with its first locations in Greater Pittsburgh and Ohio.  In June 2006, ADMI was acquired by private equity firm Ares Management LLC ("Ares") in a leveraged buyout.  That year, ADMI expanded to 100 locations, with its first in Indiana and Arizona.  In 2007, ADMI opened 35 new practices, expanding to 135 locations, including its first in Michigan and in 2008, ADMI added 47 new locations and purportedly served its millionth patient.

60.     In 2010, ADMI practices recorded more than 1.8 million patient visits, including visits from more than 422,000 new patients.  For the 12 months ending on June 30, 2010, ADMI recorded roughly $50 million of earnings before interest, taxes, depreciation, and amortization ("EBITDA") and $350 million in revenue.

61.     In or around August 2010, defendant LGP, a Los Angeles, California–based private equity firm, acquired a controlling stake in ADMI at auction for $547.5 million.  LGP contributed approximately $250 million of the common equity, and Ares and senior management rolled over approximately $117 million of equity.

        a.     According to its website, LGP is "one of the nation's preeminent private equity firms with over $14 billion of committed capital" that invests "in established

companies that are leaders in their markets."  LGP's "investment philosophy is to target cash flow positive businesses that have the ability to grow by at least 50% over a five-year period."  Moreover, according to LGP: "We rely heavily on our management partners to execute the operational and strategic business plan for the companies that we invest in."

b.   Peter J. Nolan, an LGP Managing Partner, currently serves on ADMI's Board of Directors.   He is not a dentist and has no background in dentistry.  In addition to ADMI, Nolan also serves on the Board of Directors of The Palms Hotel and Casino and Motorsport Aftermarket Group, a family of brands in the motorsport industry.

c.   John M. Baumer, an LGP Partner, currently serves on ADMI's Board of Directors.  He is not a dentist and has no background in dentistry.  In addition to ADMI, Baumer also serves on the Board of Directors of Equinox Fitness health clubs, Leslie's Poolmart, Inc., a retailer of pool supplies, Petco Animal Supplies, Inc., a retailer of pet products, and drugstore chain Rite Aid Corporation.

d.   Alyse M. Wagner, an LGP Principal, currently serves on ADMI's Board of Directors.  She is not a dentist and has no background in dentistry.  In addition to ADMI, Wagner also serves on the Board of Directors of AerSale Holdings, Inc., a supplier of aftermarket flight equipment to the aviation industry, and Animal Health International, a "premier food and companion animal health distributor offering cattle, equine, poultry, swine, cat, and dog animal health products and supplies."

62.   According to the American College of Dentists, a dentist "practices a learned profession, i.e., one who has special knowledge and skills used to benefit the public, regardless of personal gain."  A dentist's "chief motive [is] to benefit mankind,

with the dentist's financial rewards secondary … [T]he level of financial gain to the dentist must never be a consideration in any of the dentist's professional recommendations."[3]

63.    The dental industry is attractive to private equity firms because it is not as regulated as other aspects of healthcare.  An August 26, 2010 article in *Dentistry Today* reporting on LGP's bid for ADMI states:

> ***This kind of sale is unique in the dental profession because most dentists work either by themselves or with one other dentist. It would be new ground for private-equity firms because they have not been involved in dentistry as much as other aspects of healthcare.***
>
> ***These firms think this is a good move now because there is still money to be made for them in the dental profession.*** Many parts of dental care are covered by insurance, with the exception being cosmetic and oral surgery. Dentists have not been as affected as doctors by the reforms in healthcare.
>
> ***The move may not be good for the dentists who work in these chains, however, because the firms will try to maximize their profits.*** This means that the dentists may be working longer hours, something that could be counterproductive because ***it may come at the expense of good dental care.*** [Emphasis added].

64.    On September 1, 2010, ADMI CEO Fontana stated in a press release that "private equity has been part of the business since our inception more than a decade ago …. As with all private equity transactions, there comes a time when the private equity group seeks to exit its investment and a new private equity partnership is formed.  This is a normal part of the private equity-backed growth cycle."

65.    In 2011, ADMI practices recorded more than 2.2 million patient visits, including visits from more than 490,000 new patients.

---

[3] *See Ethics Handbook for Dentists*, American College of Dentists, at http://www.acd.org/ethicshandbook.

66.     In or around February 2012, ADMI announced that it would pay a $127 million dividend to shareholders, including LGP.   In order to fund the $127 millon dividend, ADMI increased the size of its term loan from $195 million to $320 million and boosted a revolving credit facility from $35 million to $50 million.  The term loan was arranged by, *inter alia*, GE Capital Markets, the lending unit of General Electric Co.

67.     GE Capital Markets also owns and controls CareCredit, a healthcare credit card that serves as primary provider of patient payment plans and financing of expenses that are not covered by dental insurance or when treatment exceeds coverage.

68.     According to Standard & Poor's Ratings Services, "[t]he transactions will boost [ADMI's] already-high financial leverage, but we believe EBITDA will grow at a low-double-digit annual rate over the next few years, helping Aspen to service its heavy debt burden."

### B.     ADMI's Corporate Structure and Business Model

69.     ADMI's principal executive offices are located at a 45,000-square-foot Practice Support Center ("PSC") in Syracuse, New York.  From these offices, ADMI and its board of directors and senior management, including CEO Fontana, set all company-wide operational policies and procedures, and operates, directs, controls, and manages the Local Offices.

70.     The PSC has 350 employees, and includes a state-of-the-art, nationwide patient scheduling center.  Staffed by more than 60 employees, the call center handles more than 70,000 calls monthly and schedules approximately 35,000 new patients a month for Local Offices throughout the country.

71.    The PSC houses all technology support functions for all of the Local Offices nationwide, provides the systems and software programs utilized by all of the Local Offices, and acts as the national epicenter for all ADMI advertising and marketing, which is originated at the PSC, published and made available to all consumers nationwide via ADMI's website, and disseminated to all Local Offices.

72.    The PSC serves as ADMI's centralized denture laboratory.  According to ADMI's website, ADMI's "Central Denture Lab" is "[o]ne of the largest denture lab facilities in the country," and it "produced more than 140,000 full and partial ComfiDents® brand dentures" in 2011 for ADMI's Local Offices throughout the country.

73.    ADMI has total control over, and responsibility for, the accounting, finance, and billing and collections for all Local Offices nationwide.  ADMI manages the Company's nationwide payroll through the PSC.   All ADMI employees, whether working at the PSC or a Local Office, are paid through ADMI's central offices.

74.    AMDI handles accounts payables and receivables, as well as payment plans such as CareCredit, at the PSC for all Local Offices nationwide.

75.    ADMI handles and controls the purchasing of each Local Office's assets, equipment, materials, and supplies through the PSC.

76.    ADMI performs all human resource functions – including, *inter alia*, recruiting, interviewing, and hiring all dentists, hygienists, and regional and office managers nationwide – at or through the PSC.  These employees receive orientation and training at the PSC's 90-seat training facility.  According to ADMI, it employs "a team of seasoned professionals who have more than 100 years of combined operations, clinical

and classroom facilitations experience," and "invests more than $6 million in training and development annually."

77.     According to ADMI, in 2010, over 750 dentists, hygienists, and regional and office managers traveled to the PSC to attend orientation and professional development programs.  Other ADMI employees, who do not travel to the PSC, are trained via ADMI's intranet system, which is maintained, operated, and controlled at the PSC.  Regardless of whether attending in-person or remote training, each and every ADMI employee learns how to use ADMI's centralized computer system and software, receives an employee handbook, and is told that the policies contained therein apply to his or her employment.

78.     ADMI has even created "Denture Step Guidelines" for each of the Local Offices to follow in performing denture-related tasks.  For example, the guidelines provide, in part:

| Task | Specifications | Tech Working Time |
|------|----------------|-------------------|
| Bite Block | From impression …………….…………………… 1 hr | |
| | From existing model …………………….………..…½ hr | |
| Repair | Acrylic based (fracture, tooth replacement) ………... 1 hr | |
| | Involving clasp or tooth addition …………………… 2 hr | |

The "Denture Step Guidelines" mandate that ADMI employees "Strictly Adhere to Pan Schedule!"

79.     ADMI mandates that all Local Offices nationwide use dental products supplied by ADMI's "strategic partner" – Dentsply International.

80.     CEO Fontana has stated that ADMI "in no way sets … production goals for the owner-doctors in the practices we serve."  This statement is false.

81.     CEO Fontana has stated: "I'm not even sure what corporate dentistry means, because we have no influence on the dentistry."  This statement is false.

82.     As reflected in internal ADMI documents – entitled Aspen Dental Monthly Financial/Metrics/Operational Review – each ADMI Local Office's financials is reviewed on a monthly basis and includes, *inter alia*, a comparison of "budgeted" vs. "actual" revenues.

83.     During training programs, ADMI emphasizes the importance of meeting production goals and that employees are expected to meet targeted revenue goals.  ADMI trains employees on how to achieve these goals and educates them on the financial rewards they may receive if they meet and/or exceed these goals.

84.     All ADMI Office/Operations Managers ("Office Manager") receive one week of training at the PSC in Syracuse. According to the Company's job description, Office Managers:

> play a vital role in the overall performance of each office.  Managers assume primary responsibility for staff management, patient service and office administration and are vital to the success of our organization. Aspen Dental managers share responsibility with Managing Clinical Directors for developing individual practices by maximizing patient services and meeting financial performance goals.

In addition, an Office Manager's job responsibilities include: "(i) educating patients with clear and concise treatment plan presentations; (ii) **committing patients to begin treatment**; (iii) **maximizing case acceptance to meet sales goals**; (iv) responding to key performance indicators to ensure practice success; and (v) staffing and motivating your office team for optimal practice performance."

85.     The qualifications for the position of Office Manager include: "(i) Bachelors Degree; (ii) 2-5 years experience in a sales or retail management environment;

and (iii) excellent verbal and written communication skills and the ability to make decisions independently."  Notably, "[k]nowledge of basic dental terminology a plus, but not required."

86.     During training, Office Managers learn about dental procedures and the various treatments and products offered in each Local Office.  They also learn how to sell those treatments and products, how to explain financing options to consumers, and about ADMI's systems and procedures, including scheduling appointments and allotting time for each procedure.

87.     The Office Managers are considered the most crucial component within the Local Offices in ADMI's business model and regularly correspond with the PSC, particularly with respect to billing, payroll, and human resources.  Indeed, Sue Decker, ADMI Vice President of Human Resources, was quoted as stating, "Aspen office managers are the key to offices running smoothly and successfully…. They need to really be there to support everybody else."  Despite, or perhaps due to, the Office Manager's crucial importance to the ADMI business model, the cornerstone position experiences a high turnover rate.

88.     ADMI's Office Managers, who have no dental training and work on commission, are primarily responsible for ensuring that the Local Office's dentist(s) meets the targeted goals and are blamed if a dentist falls short.  ADMI holds sales meetings, at a minimum, quarterly, and ideally, every month, which are attended by ADMI Regional, District, and Office Managers, as well as dentists.  ADMI's senior management sets performance and sales goals for each Local Office based on the previous year's earnings.  ADMI also determines a monthly budget that dictates what

each Local Office is expected to bill based on that Local Office's surrounding demographics.  ADMI then monitors the production of each dentist and routinely exerts pressure on the dentists and Office Managers to hit performance and sales goals.

89.    CEO Fontana has stated that ADMI's revenue targets do not apply to dentists: "I think it's important to keep in mind again, that the dentists don't have these goals … They just don't have them.  They don't exist."  This statement is false.

90.    ADMI incentivizes Office Managers and dentists alike through a profit-contingent bonus program – both the Office Managers and the dentists benefit financially if the performance goals are met.  Indeed, a video on ADMI's website entices dentists to join ADMI by representing that: "Compensation for associate dentists includes an annual salary plus bonus opportunity that increases as key targets are met."

91.    Although ADMI often employs new, inexperienced dentists that were trained at foreign dental schools, the financial incentives put in place by ADMI incentivize Office Managers to maximize patient turnover while simultaneously minimizing expenses.  The result is a high number of patients – often higher than can be reasonbly expected to receive adequate care – being treated with a shortage of supplies and materials and equipment in disrepair.  ADMI's profit-based incentive program encourages Office Managers to, *inter alia*, bill patients for treatments that were not provided.

92.    In an email from an ADMI Regional Operations Manager to a group of Office Managers, entitled "EYE ON THE PRIZE!!!," the Regional Operations Manager instructed as follows:

Ladies and gentleman-

Please review your schedules and open work today I would like to know what

each of you have planned to [] get back into the black. Looking through most of the schedules we are very week [sic] on getting appointments made. If a patient has more than one fill we should try to schedule multiples together. ***Denture cases are priority so please move non-priority procedures out and priority procedures in. Remember: rock, water, sand.***

### 1.    ADMI's "Smart Scheduling System"

93.    ADMI expects its dentists to keep two to three chairs active at a time. Chair 1 is the procedure chair and is used for extraction cases, bridges, crowns, and fillings; ADMI always wants Chair 1 available, as extractions, bridges, and crowns are the most lucrative.  Chair 2 is for new patient examinations.  Chair 3 is for overflow and follow-up procedures, such as re-cementing of crowns, bridges, denture adjustments, and delivery of permanent dentures.  Since patients are billed in full up front, ADMI has no incentive to have the patient return and take up chair time that would otherwise be used to generate revenue.

94.    In order to ensure that each chair is filled by a patient that will maximize revenue, ADMI created a "smart scheduling system" ("SSS") software program that is used by all Local Offices nationwide.

95.    The SSS is designed to schedule patients in an order and frequency that maximizes profits.  For example, since extractions, bridges, and crowns are far more lucrative than fillings, the SSS is designed to allow only two (2) fillings per day.  Patients that need fillings, other general dentistry, and follow-up (no-charge) denture adjustments, are rejected by the SSS and pushed out over an extended period of time.  To illustrate, if a patient needs a filling and calls for an appointment, an ADMI employee logs into the SSS and hits "schedule appointments."  If there are already two (2) fillings scheduled that day (even if the schedule is otherwise wide open), the SSS will automatically look to the next

30 days to schedule the filling on a day where no more than two (2) fillings are being performed.

96.     Further, it is a customary ADMI practice to cancel out patients who are scheduled for inexpensive fillings and replace them with more expensive procedures like extractions and crowns.

### 2.     ADMI's Patient Treatment Plan

97.     Once a patient is scheduled through the SSS, ADMI protocol mandates that new patients undergo a full examination before absolutely any other work is done. This exam-before-cleaning protocol, one of the hallmarks of ADMI's business model, is the opposite of the standard procedure expected by patients at a dentist's office where, typically, a hygienist performs a cleaning first, then a dentist conducts an exam. Therefore, even if a new patient requests a routine cleaning, in accordance with ADMI protocol, they must first be subjected to an exam so the dentist can determine whether they qualify for a "routine cleaning" or require a more expensive deep cleaning – also known as "scaling."

98.     After the examination, but before actually performing the cleaning, the ADMI dentist recommends a treatment plan, which may include extractions – often whole mouth extractions or "flippers" (partial dentures).   The treatment plan also automatically (and surreptitiously) includes oral cancer screening and an expensive Rotadent© toothbrush.

99.     Following the examination, the patient is then escorted into a business office to meet with the ADMI Office Manager.  Described as "high-pressure dentistry," and as confirmed by numerous patients, the Office Manager prepares a patient's

treatment plan based on the dentist's examination and uses aggressive sales tactics to get the patient to commit to the treatment plan. To create the treatment plan, the Office Manager inputs the dentist's recommendations into ADMI's computer system which, based on proprietary ADMI software, creates a plan and cost estimates for the treatment program. According to sources, the average treatment plan sold to new patients at ADMI's top-producing Local Offices runs approximately $4,450.00.

100. If the patient provides insurance information, ADMI's software provides an estimate of the patient's out-of-pocket expenses. For patients who need dentures, the Office Manager shows them a "denture board" – a physical board created, and provided to the Local Offices, by ADMI, that displays different models of dentures sold by ADMI that vary in several respects, including price and length of warranty. Patients can choose the type of dentures and the shade of the teeth. The Office Manager then inputs the patient's choice of denture, the dentist's recommendations, and the patient's insurance coverage into ADMI's software program, which produces a treatment plan and outlines the patient's out-of-pocket costs.

101. Once the treatment plan is in place, ADMI policy dictates that the dentist must abide by both the order and substance of the treatment plan. This is true even if the dentist who conducted the initial examination is no longer with ADMI. If a patient questions a treatment plan – for example, inquiring whether they needed a scaling when they had come in for a routine cleaning or objecting to the order of the procedures due to cost – the dentist must nonetheless abide by the treatment plan.

### 3.    ADMI's Billing Practices

102.    Nationwide patient billing is handled at ADMI headquarters in Syracuse and is based on the patient's treatment and insurance information input into the system by the ADMI Office Manager.  Patients have few choices when faced with an estimate for dental work: (a) pay out-of-pocket; (b) only undergo procedures covered by insurance; (c) finance all or part of the treatment through CareCredit; or (d) refuse any and all work.

103.    Very often, ADMI's patients are price-gouged to the point that insurance does not cover the entire cost of treatment. Once an insurance company processes a claim, the balance is billed to patients.

104.    ADMI bills its patients for the entire cost of the treatment plan before any procedures are performed.  As a consequence, patients are often forced to take out health care credit cards – such as CareCredit – which, according to CEO Fontana, "provide an important service to patients."  CareCredit, utilized by more than 20 million patients and 90,000 dental practices nationwide, is under common ownership and control with GE Money Bank and is held out to the public as a "division" of GE Money Bank.

105.    ADMI has created a script for Local Offices to use when explaining the financing to patients; however, the script omits several material facts.  Excluded from the scripted explanation of CareCredit is that CareCredit offers money and things of value to ADMI to steer patients to finance their dental procedures with the card.  For example, CareCredit charges ADMI a fee for the right to offer CareCredit financing, and then rebates part of the fee based on the volume of business generated through CareCredit financing.  CareCredit also engages in a policy and practice of advancing funds to ADMI

for work not yet performed by ADMI, debiting the patients' accounts for such funds, and charging the patients finance charges on such funds.

106.    According to an August 2010 press release by then-New York Attorney General Andrew Cuomo, "the kickback arrangement, plus CareCredit's payment in full to providers within two days of the charge, creates an incentive for providers to push consumers to use CareCredit … in fact, providers pushed CareCredit over cash."  Cuomo alleged that CareCredit pays kickbacks in the form of rebates to the providers for any business they get charged on these cards.  According to Cuomo, "[p]atients are being misled into paying for services they never received by the people they should be able to trust the most – their doctors.  Doctors are supposed to represent patients, not credit card companies, no matter what kind of kickbacks they are offered."

## DEFENDANTS ENGAGE IN THE CORPORATE PRACTICE OF MEDICINE IN VIOLATION OF NEW YORK LAW

### A.    Background

107.    The Corporate Practice of Medicine doctrine ("CPOM") prohibits unlicensed individuals and non-physician owned and controlled entities from employing licensed physicians to provide professional medical services.[4]  A product of the 19th century, the CPOM doctrine emerged to combat two forms of corporate involvement in medicine: (1) "contract practice," where corporations employed physicians to provide medical services to their employees; and (2) "corporate practice," where physicians' services were marketed to the public by corporations which either employed physicians or contracted separately for their services.[5]

---

[4] Jim Moriarty & Martin J. Sigel, *Survey of State Laws Governing the Corporate Practice of Dentistry*, *available at* http://www.moriarty.com/content/documents/ML_PDFs/cpmd_4.10.12.pdf.
[5] Jim Moriarty & Martin J. Sigel, *supra*.

108.    Created by the American Medical Association ("AMA"), the CPOM doctrine is premised upon the principle that physicians should act autonomously.[6]  It sought to ensure that only licensed professionals deliver medical care and that lay persons and entities, and external factors such as business and financial interests, not influence treatment decisions, and also strove to "protect patients from potential abuses because commercialized medicine would ultimately divide a physician's loyalty between profits and the delivery of quality patient care."[7]  In furtherance of these goals, the CPOM doctrine prohibits the division or splitting of professional fees between physicians and lay persons/entities and/or the payment for referrals.

109.    In 1912, the AMA declared it "unprofessional" for physicians to practice medicine under a corporate umbrella.[8]  Ten years later, the AMA Judicial Council noted:

> It was decided long ago that the practice of law by a corporation was against public policy and the same has been prohibited by law in many states. The relations between patient and physician are more intimate than are those between client and attorney. It is impossible for that intimacy of relationship to exist between and [sic] individual and a corporation and if it is against public policy for a corporation to practice law, how much more so must it be for a corporation to practice medicine.[9]

110.    In 1934, the AMA again addressed the CPOM "by criticizing contractual arrangements in which lay persons and lay entities profited from the medical services rendered by physicians."[10]  The CPOM doctrine has been recognized in many states – by statute and/or common law – who were also concerned that the "corporate practice of

---

[6] Nicole Huberfeld, *Be Not Afraid of Change: Time to Eliminate Corporate Practice of Medicine Doctrine*, 14 HEALTH MATRIX 243, 248-49 (2004).
[7] John W. Jones, Corporate Medicine in the 21st Century Health Care (Physician's News Digest, June 2007).
[8] AM. MED. ASS'N, PRINCIPLES OF MEDICAL ETHICS, ch. II, art. V, § 2 (1912).
[9] AM. MED. ASS'N, REPORT OF THE JUDICIAL COUNCIL (interpreting Section 6 of Principles of Medical Ethics) (1922).
[10] Kevin Reed, *Physician Employment and Corporate Practice of Medicine Issues*, The University of Texas School of Law, 18th Annual Health Law Conference Presentation, April 2006.

medicine" posed a conflict-of-interest between the corporation's interests and the physician's ethical obligations to its patients.  They believed that a corporation's desire to maximize profits and reduce costs would interfere with a physician's independent judgment and the sanctity of doctor-patient relationships, and that the "commercialization of (medicine), exploitation of the public, and quackery" were inevitable.[11]

111.    Under the various state CPOM doctrines, a business corporation can be formed and licensed to practice medicine; however, a physician must control the business entity.[12]  Further, even those states without a CPOM doctrine "prohibit corporate and non-licensee interference with dentists' independent performance and clinical judgment."[13]  In its modern incarnation, the CPOM doctrine often manifests in state law through three prohibitions:

> (1) [A] non-licensed person or corporation cannot employ a physician or any other health care professional to practice medicine.
>
> (2) [E]ntities that provide health care services, including partnerships, professional corporations, limited liability companies, and nonprofit corporations, generally cannot be owned or controlled by non-licensed persons or general corporations.
>
> (3) [L]icensed professionals may not divide or share a professional fee with a non-licensed person or entity, because such 'fee splitting' can be considered assisting an unlicensed person to practice medicine and could be an improper influence of the professional's behavior.[14]

112.    The Medical Board of California has further elaborated on the CPOM, noting that a business entity exercises control and decision making over a medical practice when:

---

[11] Sara Mars, *The Corporate Practice of Medicine: A Call for Action*, HEALTH MATRIX 242, 242 (Winter 1997) (quoting Alanson W. Willcox, *Hospitals and the Corporate Practice of Medicine*, 45 CORNELL L. Q. 432, 434 (1960)).
[12] *See* State Prohibition on Hospitals Employment of Physicians, "Department of Health and Human Services, Office of Inspector General," Document No. OEI-01-91-00770 (November, 1991).
[13] Jim Moriarty & Martin J. Sigel, *supra*.
[14] Nicole Huberfeld, *supra* at 244.

(1) determining the type and quality of medical facilities, equipment, and supplies to be provided for its provision of medical services, and/or, in fact, providing only a license to the doctors to use the medical facilities of the employing corporation; and/or

(2) hiring and firing of clerical and administrative personnel, setting fees for the provision of medical services, creating the billing procedures and receiving payment for medical services; and/or

(3) notwithstanding any written language or agreements to the contrary, the hiring, firing, and payment of salaries to medical personnel including physicians and nurses; and/or

(4) setting of the doctors' compensation based upon a flat percentage of gross receipts; and/or

(5) subordinating the doctors' authority and/or medical decision-making to the employing corporation personnel not licensed in [state]; and/or

(6) lending the doctors' medical and/or DEA licenses to or otherwise allowing unlicensed individuals to purchase drugs, pharmaceuticals, and biologics using the doctors' medical and/or DEA license; and/or

(7) restricting the doctors from ownership and/or control of original medical records and, in fact, providing for unlicensed individuals or entities to maintain custody and control and transfer of patient medical records; and/or

(8) restricting the doctors from hiring or soliciting certain employees or independent contractors; and/or

(9) providing the doctors with malpractice insurance in coverage amounts and by companies chosen by the employing corporation; and/or

(10) providing that the doctors' contract (management services agreement) can be assigned to any other party who acquires all or substantially all of the assets of the employing corporation; and/or

(11) restricting the doctors from voting, selling or transferring their ownership/shares in any professional corporation they might otherwise own, without the employing corporation's permission; and/or

(12) controlling the mode and content and contracts for advertising and website content.[15]

---

[15] The Medical Board of California, *Enforcement Actions Re Unlicensed Corporate Practice of Medicine, available at* http://www.mbc.ca.gov/board/meetings/materials_2011_05-05_advisory-6.pdf.

**B.      New York State Prohibits the Corporate Practice of Medicine**

113.    New York Education Law § 6521 defines the practice of medicine as "diagnosing, treating, operating, or prescribing for any human disease, pain, injury, deformity or physical condition."[16]

114.    New York prohibits the corporate practice of medicine by allowing only New York State-licensed dentists to practice dentistry.[17]  The unauthorized practice of dentistry is a felony in New York,[18] and the Attorney General has the power to prosecute the unauthorized practice if an investigation "substantiates that violations exist...."[19]

115.    New York's licensing requirements were enacted to prohibit the corporate practice of medicine that could result in fraudulent practices such as, *inter alia*, billing for treatments that were not provided.

116.    New York permits dentists to form professional corporations as long as the corporations are ***owned, operated and controlled*** by licensed dentists.[20]

117.    For example, New York Business Corporation Law § 1507 provides that a physician shareholder of a medical professional corporation must be actively engaged in the practice of medicine through the professional corporation for it to be lawfully licensed.  BCL § 1507 provides as follows:

---

[16] NY EDUC. LAW § 6521.

[17] *See* N.Y. Bus. Corp. Law § 1501, *et seq.*; N.Y. Educ. Law § 6602.

[18] NY EDUC. LAW § 6512(1) ("Anyone not authorized to practice under this title who practices or offers to practice or holds himself out as being able to practice in any profession in which a license is a prerequisite to the practice of the acts, or who practices any profession as an exempt person during the time when his professional license is suspended, revoked or annulled, or who aids or abets an unlicensed person to practice a profession, or who fraudulently sells, files, furnishes, obtains, or who attempts fraudulently to sell, file, furnish or obtain any diploma, license, record or permit purporting to authorize the practice of a profession, shall be guilty of a class E felony.").

[19] NY EDUC. LAW § 6514(1).

[20] *See* N.Y. LLC Law §§ 1203, 1207; N.Y. Bus. Corp. Law §§ 1501, 1503(a), 1507, 1508.

**Issuance of Shares**

A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation … or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued … ***All shares issued, agreements made, or proxies granted in violation of this section shall be void***.
[Emphasis added].

118.    The legislative history of BCL § 1507 is instructive.  In 1971, the State Education Department, commenting on the proposed amendment to BCL § 1507, stated: "This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, ***it maintains the basic concept of restricting ownership to professionals working within the corporation***."   [Emphasis added].

119.    As a corollary, in accordance with New York's prohibition against lay ownership of shares in medical corporations (and the accompanying potential for fraud), a corporation cannot practice medicine or dentistry by hiring doctors or dentists to act for it.

120.    Likewise, it is the established public policy of New York State that medical providers may not engage in voluntary prospective fee-splitting arrangements. Under Section 6509-a of the New York Education Law, a dentist may be guilty of professional misconduct if the dentist:

has directly or indirectly requested, received or participated in the division, transference, assignment, rebate, splitting or refunding of a fee for, or has directly requested, received or profited by means of a credit or

other valuable consideration as a commission, discount or gratuity in connection with the furnishing of professional care, or service . . . .[21]

121.     Moreover, this precept has been codified as a rule of the Board of Regents applicable to all licensed professions since 1977.  New York State Education Department regulations, which define "unprofessional conduct" in the practice of any licensed profession, forbid, *inter alia*:

> (4) permitting any person to share in the fees of professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice in the same profession, or a legally authorized trainee participating under the supervision of a licensed practitioner. This prohibition *shall include* any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a professional licensee constitutes a percentage of, or is otherwise dependent upon, the income of receipts of the licensee from such practice . . . .[22]

122.     Accordingly, firmly established New York law prohibits the sharing of professional fees with anyone other than a partner or associate in the same profession, and business corporations commit unlicensed practice by employing dentists or doctors or sharing their fees. This prohibition includes, as New York courts have held, corporations entering into contracts with medical professionals to provide accounting, billing, personnel, and other management services in exchange for fees.  As a result, the use of a nominal or sham owner equates to a fraudulently licensed medical corporation and constitutes behavior tantamount to fraud.

---

[21] NY EDUC. LAW § 6509-a.
[22] NY EDUC. LAW § 6530(19).

123.    Because fee sharing with an unlicensed individual is professional misconduct, an agreement to share fees between a dentist and a non-dentist is void and unenforceable.

124.    Under New York law, several factors should be weighed to determine if an "owner" is a sham, including, *inter alia*: (1) whether the "owner" made any monetary investment in the corporation; (2) whether the profits were paid to the "owner" or there was an agreement by which most of the profits were "channeled" to a non-physician; (3) whether the "owner" had any dealings with the employees; (4) whether the "owner" practiced at the facilities; (5) how money funneled out of the bank accounts; and (6) who is the named tenant on the lease of the property.

### C.    Defendants Engage in the Unlawful Corporate Practice of Medicine

125.    According to CEO Fontana:

ADMI provides management services to 73 practices owned by 76 licensed dentists … Numerous dentists own multi-office practices.  The "lead doctor" at a practice may be an owner or an employee of the dentist-owner as is the case in any multi-office professional practice.

CEO Fontana has also stated that dentists own and control all ADMI practices.  These statements are false.

126.    As discussed at length herein, New York prohibits the corporate practice of dentistry – in other words, non-dentists are prohibited from owning, operating, or controlling companies that are formed for the purpose of providing dental services.  New York law also requires the owner of a dental service company to practice at the company's location.

127.    In the Winter 2009 issue of ADMI's newsletter, *AllSmiles*, CEO Fontana stated: "We're on track to open 50 new practices this year, bringing our total to 230 by

the end of 2009.  We will also relocate three offices and have already completed the relocation of our Albany office."

128.    As stated by CEO Fontana, ADMI *opens* dental practices.  To do so, it pays or otherwise compensates licensed dentists to form professional service corporations and professional service limited liability companies to fraudulently create a façade that licensed dentists own, operate, control, and actively engage in the practice of dentistry through the Local Offices.

129.    As demonstrated by the examples below, none of the so-called Aspen Dental "Practice Owners" – as they are referred to by ADMI and CEO Fontana – "own," "operate," or "control" ADMI's Local Offices.  They are not actively engaged in the practice of dentistry and do not supervise ADMI personnel who perform the billed-for services at the Local Offices.  This results in price gouging, billing for services not provided, and billing for products and services without patient authorization and consent, as ADMI employees are incentivized to do so by ADMI's bonus structure and are subject to the pecuniary interests of Defendants, who are not dentists, as opposed to the independent medical judgment of a true dentist-owner.  The revenues and profits generated by ADMI's Local Offices are not paid to the so-called "owner," but rather, are channeled to Defendants.

### 1.    Judge Dental, PLLC

130.    ADMI dentist Gursimrat K. Judge, D.D.S. is also known as Gursimrat Kaur Bajwa Judge – New York License No. 045649; Cal. No. 18214.

131.    In 1999, Dr. Judge was disciplined for failing to maintain accurate patient records and failing to explore alternative treatments with a patient prior to treatment

being rendered.  On December 17, 1999, Dr. Judge consented to a penalty of a one-year suspension, the execution of which was stayed subject to probation of one year, to commence if and when she returned to practice, as well as a $3,000 fine.

132.   Judge Dental, PLLC is a New York professional service limited liability company which, according to records on file with the New York State Department of State ("NYSDOS") and the New York State Education Department ("NYSED"), was formed in March 2008 by Gursimrat Judge, D.D.S.

133.   In forming Judge Dental, PLLC, Dr. Judge represented to the State of New York that Judge Dental, PLLC would be owned, operated, and controlled only by individuals licensed to practice dentistry.  However, Judge Dental, PLLC, formed under the facially valid cover of Dr. Judge, was fraudulently incorporated as it is a mere sham set up in the form of a legitimate dental practice when, in fact, it was, and at all relevant times has been, owned, operated, and controlled by unlicensed individuals or entities – *i.e.*, Defendants.

134.   Dr. Judge's entity ostensibly "owns" at least three (3) of ADMI's New York Local Offices – Utica, Rome, and New Hartford – which thousands of members of the Classes visited.  Through these Local Offices, thousands of members of the Classes paid ADMI for dental services and products.

135.   Dr. Judge is related to Arwinder S. Judge, D.D.S., who is currently ADMI's Vice President of Clinical Support.  According to ADMI, he serves as "clinical liaison to more than 460 dentists across the Aspen Dental network" and "has owned six dental practices."

136.    Arwinder Judge, who lives in Fayetteville, New York – approximately 8 miles from ADMI's headquarters – has assisted ADMI in expanding into other states.

137.    For example, Arwinder formed KTY Dental, PSC, which "owns" several Aspen Dental offices in the State of Kentucky at which he is not actively engaged in the practice of dentistry and at which thousands of members of the Classes visited and paid ADMI for dental services and products.

138.    Certain ADMI Local Offices in Kentucky operate under AKDM, LLC. According to public records, AKDM, LLC's principal office is located at ADMI's headquarters in Syracuse.  AKDM, LLC's 2010, 2011, and 2012 Annual Report Online Filings were signed by ADMI CFO Geoffrey F. Lewis, "[o]n behalf of ASPEN DENTAL MANAGEMENT, INC., Member."

### 2.    Anand Dental Health Services, P.C.

139.    Vikramjit Singh Anand (License No. 044777; Cal. No. 18927) is also an ADMI dentist.

140.    In 2001, Dr. Anand admitted to a charge of extracting healthy teeth without medical justification and dispensing inordinate amounts of controlled substances without medical justification.  On April 24, 2001, Dr. Anand consented to a penalty of a three-year suspension with leave to apply, after one year, for a stay of execution of any unserved portion of the suspension.  Upon service of a three-year suspension or upon a stay of execution of any unserved portion of the suspension, Dr. Anand would be on probation for two years upon returning to practice.  He also received a $4,500 fine.

141.    In 2006, Dr. Anand did not contest a charge of having been convicted of filing a false claim for Medicaid reimbursement.  On January 10, 2006, Dr. Anand

surrendered the certificate of incorporation for Vikramjit S. Anand, D.D.S., P.C., and received a $5,000 fine.

142.    Anand Dental Health Services, P.C. is a New York professional corporation, which, according to records on file with the NYSDOS and NYSED, was formed in June 2006 by Dr. Anand.

143.    In forming Anand Dental Health Services, P.C., Dr. Anand represented to the State of New York that Anand Dental Health Services, P.C. would be owned, operated, and controlled only by individuals licensed to practice dentistry.  However, Anand Dental Health Services, P.C., formed under the facially valid cover of Dr. Anand, was fraudulently incorporated as it is a mere sham set up in the form of a legitimate dental practice when, in fact, it was, and at all relevant times has been, owned, operated, and controlled by unlicensed individuals or entities – *i.e.*, Defendants.

144.    Dr. Anand's entity ostensibly "owns" at least two (2) of ADMI's New York Local Offices – Elmira and Ithaca – which thousands of members of the Classes visited.  Through these Local Offices, thousands of members of the Classes paid ADMI for dental services and products.  According to other documents, Dr. Anand practices at 22 of ADMI's Local Offices in New York.

### 3.    Aspen Dental Associates of New York, P.C. and Aspen Dental of Central New York, PLLC

145.    Isam F. Hamati is an ADMI dentist and has been a true ADMI "team player" for several years.

146.    Aspen Dental Associates of New York, P.C. is a New York professional service corporation, which, according to records on file with the NYSDOS and NYSED,

was formed in December 1998 by Dr. Hamati and Halina B. Bierciewska, D.D.S. (who, based on records, appears to be related to Dr. Hamati).

147.   According to the NYSDOS records, Aspen Dental Associates of New York, P.C.'s Principal Executive Office is located at ADMI's headquarters in Syracuse.

148.   Aspen Dental of Central New York, PLLC is a New York professional service limited liability company, which, according to records on file with the NYSDOS and NYSED, was formed in October 2009 by Dr. Hamati.

149.   In forming Aspen Dental of Central New York, PLLC, Dr. Hamati represented to the State of New York that Aspen Dental of Central New York, PLLC would be owned, operated, and controlled only by individuals licensed to practice dentistry.   However, Aspen Dental of Central New York, PLLC, formed under the facially valid cover of Dr. Hamati, was fraudulently incorporated as it is a mere sham set up in the form of a legitimate dental practice when, in fact, it was, and at all relevant times has been, owned, operated, and controlled by unlicensed individuals or entities – *i.e.*, Defendants.

150.   According to public records, Aspen Dental of Central New York, PLLC's address for service of process is 124 Northern Lights Drive in Syracuse – the address of the ADMI Local Office known as "Northern Lights" in North Syracuse.   In addition, according to public records, ADMI owns the property at which the Northern Lights office is located.

151.   Drs. Hamati and Bierciewska, who live in Manlius, New York – approximately 12 miles from ADMI's headquarters – are involved in a multitude of ADMI-related ventures, many of which are out-of-state, that leave them with no time or

ability to be actively engaged in the practice of dentistry through any of the professional entities that they nominally "own."

152.    For example, according to documents, Dr. Hamati practices at 28 of ADMI's Local Offices in New York.

153.    Drs. Hamati and Bierciewska facilitated ADMI's expansion into Iowa by forming H.B. Dental, P.C. d/b/a/ Aspen Dental, with an address at 4272 Fraser Fir Drive in Manlius, New York.  H.B. Dental, P.C. ostensibly "owns" at least one of ADMI's Local Offices in Iowa – the Waterloo Local Office.

154.    Dr. Hamati also assumed sham "ownership" of Aspen Dental Associates of New England, P.C., the successor to EC Dental, P.C., which facilitated ADMI's expansion into several states, including New Hampshire.  As public records reflect, Dr. Hamati used both the Manlius and ADMI headquarters addresses.

155.    This entity was also used by ADMI, via Dr. Hamati, to expand into Rhode Island.  Aspen Dental Associates of New England, P.C. ostensibly "owns" at least one (1) of ADMI's Local Offices in Rhode Island – Warwick – which thousands of members of the Classes visited.  Through this Local Office, thousands of members of the Classes paid ADMI for dental services and products.

156.    This same entity was also used by ADMI, via Dr. Hamati, to expand into Massachusetts.  As public records reflect, in addition to Dr. Hamati, the "Contact Person" is Geoffrey F. Lewis – ADMI's Chief Financial Officer.  Aspen Dental Associates of New England, P.C. ostensibly "owns" at least six (6) of ADMI's Local Offices in Massachusetts – Fall River, South Weymouth, Brockton, Seekonk, Quincy, and Attleboro

– which thousands of members of the Classes visited.  Through these Local Offices, thousands of members of the Classes paid ADMI for dental services and products.

157.    In 2007, ADMI, via Dr. Hamati, formed Aspen Dental of Michigan, P.C. to expand into, and open Local Offices in, Michigan and, again, used the Manlius, New York address.  Aspen Dental of Michigan, P.C. ostensibly "owns" at least ten (10) of ADMI's Local Offices in Michigan – Bay City, Flint, Traverse City, Lansing, Mount Pleasant, Grand Rapids, Grandville, Adrian, Holland, and Saginaw – which thousands of members of the Classes visited.  Through these Local Offices, thousands of members of the Classes paid ADMI for dental services and products.  According to documents, Dr. Hamati practices at the Traverse City Local Office.

158.    In 2008, ADMI, via Dr. Hamati, formed I.F. Hamati, D.D.S., P.C. d/b/a Aspen Dental to open Local Offices in Illinois.  I.F. Hamati, D.D.S., P.C. ostensibly "owns" at least eight (8) of ADMI's Local Offices in Illinois – Mattoon, Sterling, Rockford, Springfield, Peoria, Bourbonnais, Machesney Park, and Moline – which thousands of members of the Classes visited.  Through these Local Offices, thousands of members of the Classes paid ADMI for dental services and products.  The address listed for this entity is the address of ADMI's headquarters.

a.    According to a former ADMI dentist who worked in ADMI's Local Office in Bourbonnais, Illinois, Dr. Hamati was never present in the Local Office that he purported to "own."

b.    The former ADMI dentist, outraged by ADMI's business model and Dr. Hamati's absence and failure to supervise, confronted Dr. Hamati over the telephone.

When the dentist asked Dr. Hamati how he could conduct business this way, Dr. Hamati responded: "They're just investments for me."

159.    In 2003, Dr. Hamati, along with Dr. Rubins Noel (discussed below), registered Aspen Dental Associates of New York, P.C. to do business as a foreign corporation in Pennsylvania.

### 4.    Dental Services of Western New York PLLC

160.    Rubins Noel is an ADMI dentist and has been a true ADMI "team player" for several years.

161.    According to records on file with the NYSDOS and NYSED, Dental Services of Western New York PLLC was formed in September 2004 as a New York professional service limited liability company.  Dr. Noel's entity ostensibly "owns" at least six (6) ADMI New York Local Offices – Lockport, Tonawanda, Buffalo, Blasdell, Cheektowaga, and Niagara Falls – which thousands of members of the Classes visited. Through these Local Offices, thousands of members of the Classes paid ADMI for dental services and products.

162.    In forming Dental Services of Western New York PLLC, Dr. Noel represented to the State of New York that Dental Services of Western New York PLLC would be owned, operated, and controlled only by individuals licensed to practice dentistry.  However, Dental Services of Western New York PLLC, formed under the facially valid cover of Dr. Noel, was fraudulently incorporated as it is a mere sham set up in the form of a legitimate dental practice when, in fact, it was, and at all relevant times has been, owned, operated, and controlled by unlicensed individuals or entities – *i.e.*, Defendants.

163.    Dr. Noel is involved in a multitude of ADMI-related ventures.  According to documents, Dr. Noel practices at 23 of ADMI's New York Local Offices.

164.    In 2005, with the help of Dr. Noel, who lives in Buffalo, New York, ADMI formed Aspen Dental Associates of Western PA, P.C. to open Local Offices in Ohio, which thousands of members of the Classes visited.  Through these Local Offices, thousands of members of the Classes paid ADMI for dental services and products.

### 5.    Aspen Dental Associates of Hudson Valley, PLLC

165.    Augustin G. Iancu is an ADMI dentist and has been a true ADMI "team player" for several years.

166.    Dr. Iancu is involved in a multitude of ADMI-related ventures.  According to documents, Dr. Iancu practices at 23 of ADMI's New York Local Offices.

167.    According to records on file with the NYSDOS and NYSED, Dr. Iancu and Michaela Serseloudi, D.D.S. (who may be related to Dr. Iancu) formed Aspen Dental Associates of Hudson Valley, PLLC in 2008 as a New York professional service limited liability company.  Dr. Iancu's entity ostensibly "owns" at least eight (8) ADMI New York Local Offices – Latham, Albany, Queensbury, Newburgh, Middletown, Schenectady, Saratoga Springs, and Poughkeepsie – which thousands of members of the Classes visited.  Through these Local Offices, thousands of members of the Classes paid ADMI for dental services and products.

168.    In forming Aspen Dental Associates of Hudson Valley, PLLC, Drs. Iancu and Serseloudi represented to the State of New York that Aspen Dental Associates of Hudson Valley, PLLC would be owned, operated, and controlled only by individuals licensed to practice dentistry.  However, Aspen Dental Associates of Hudson Valley,

PLLC, formed under the facially valid cover of Drs. Iancu and Serseloudi, was fraudulently incorporated as it is a mere sham set up in the form of a legitimate dental practice when, in fact, it was, and at all relevant times has been, owned, operated, and controlled by unlicensed individuals or entities – *i.e.*, Defendants.

### 6.     Aspen Dental of Rochester, PLLC

169.    Iswara P. Parvathaneni and Dan Sorin Doaga are ADMI dentists who have been true ADMI "team players" for several years.

170.    Aspen Dental of Rochester, PLLC is a New York professional service limited liability company, which, according to records on file with the NYSDOS AND NYSED, was formed in November 2009 by Drs. Parvathaneni and Doaga.  This entity ostensibly "owns" at least seven (7) ADMI New York Local Offices – Batavia, Canandaigua, Webster, Irondequoit, Henrietta, Gates, and Greece – which thousands of members of the Classes visited.  Through these Local Offices, thousands of members of the Classes paid ADMI for dental services and products.

171.    In forming Aspen Dental of Rochester, PLLC, Drs. Parvathaneni and Doaga represented to the State of New York that Aspen Dental of Rochester, PLLC would be owned, operated, and controlled only by individuals licensed to practice dentistry.  However, Aspen Dental of Rochester, PLLC, formed under the facially valid cover of Drs. Parvathaneni and Doaga, was fraudulently incorporated as it is a mere sham set up in the form of a legitimate dental practice when, in fact, it was, and at all relevant times has been, owned, operated, and controlled by unlicensed individuals or entities – *i.e.*, Defendants.

### 7.      Tennessee and Oregon

172.    ADMI has also expanded into Tennessee and Oregon.

173.    In 2009, a professional corporation called AJ & Associates Dental, P.C. was formed as a Tennessee professional corporation.   As records on file with the Tennessee Secretary of State reflect, the mailing address for this entity is ADMI's headquarters in Syracuse.

174.    Also in 2009, a professional corporation called Aspen Dental of Oregon, P.C. was formed as an Oregon professional corporation to "render dental services."  As records on file with the Oregon Secretary of State reflect, the mailing address for this entity is ADMI's headquarters in Syracuse.

### D.      Defendants Violate New York's Prohibition of the Corporate Practice of Medicine

175.    Although the corporate formation papers filed with the NYSDOS represent that individual licensed dentists are the "owners" (either as the shareholder of a professional corporation or the member of a limited liability company) of entities that own, operate and control ADMI's Local Offices, in fact, none of these dentists is – or ever was – a true "owner" of ADMI's Local Offices.

176.    The ostensible "ownership" of the Local Offices by the aforementioned dentists is merely nominal, as Defendants operate, and have de facto ownership of and control over, the Local Offices.  ADMI's so-called "Practice Owners" are nothing more than de facto employees and/or independent contractors of ADMI.

177.    None of the aforementioned dentists, who are given the superficial title of "Practice Owner," provided the capital for the opening, establishment or operation of ADMI's Local Offices, nor did they assume the risk of loss of the Local Offices.  In

addition, none of these dentists are entitled to, nor do they, reap the profits from the Local Offices.   Rather, any and all revenues and profits generated by the Local Offices are channeled to Defendants.   In addition, none of ADMI's so-called "Practice Owners" have the power to sell or otherwise dispose of any ADMI's Local Offices.

178.   At all times, ADMI has been the true owner, operator, and manager of, with total control over, the Local Offices throughout the country.   ADMI scouts the locations and funds the opening and operation of ADMI's Local Offices.

179.   All revenues and profits generated by the Local Offices are channeled to Defendants.

180.   ADMI establishes all operational policies and procedures necessary for establishing the standards of patient care at the Local Offices.

181.   ADMI recruits, employs, trains, promotes, directs, supervises, and terminates the employment of the staff at the Local Offices.

182.   ADMI performs all of the business functions of the Local Offices and acquires the assets, equipment, and supplies for the Local Offices.   Likewise, ADMI performs the bookkeeping, accounting, billing and collection, human resources, marketing, legal, government affairs, compliance and IT support functions for the Local Offices.

183.   In sum, ADMI is the true "owner" of the Local Offices.   By engaging in the misconduct alleged herein, Defendants intentionally, willfully and materially engage in the unlawful corporate practice of medicine.

184.   In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's   public   statements,   Defendants   uniformly   misrepresent   (and   have

misrepresented) material facts, to the consuming public and ADMI's patients, including Plaintiffs and the members of the Classes, expressly and/or impliedly, that all of ADMI's Local Offices nationwide are lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.  In fact, however, as Defendants fail to disclose, ADMI's Local Offices are not lawfully licensed and not authorized to practice dentistry because, at all relevant times, the Local Offices have been, *inter alia*:

    a.   unlawfully incorporated and owned, operated, and controlled not by licensed dentists, but rather, by Defendants, who are not dentists and who own ADMI's Local Offices solely for their own financial benefit while designating dentists – who are not actively engaged in the practice of dentistry through the professional corporation – as sham "owners";

    b.   nominally "owned" by dentists such as, for example, the aforementioned dentists, who are not actively engaged in the practice dentistry through the professional corporations; and

    c.   engaging in unlawful fee-splitting with Defendants, who are not dentists.

185.   The Center for Public Integrity ("CPI") and PBS/Frontline conducted a joint investigation into ADMI's corporate practice of dentistry, exposing the true corporate ownership of ADMI Local Offices and the incentive-based business model that ADMI employs across the nation.

186.   United States Senator Charles E. Grassley has commenced an investigation into the corporate practice of dentistry, including ADMI.

187.    In 2010, the Pennsylvania Attorney General took action against ADMI, alleging that, though ADMI advertised "free" exams, it nevertheless charged patients with dental insurance – a fact that it did not disclose.  The Pennsylvania Attorney General also alleged that ADMI failed to disclose that the "no interest" health care credit cards it pushes – like CareCredit – actually impose significant penalties for failure to pay on time.

## PLAINTIFFS' ALLEGATIONS

### Carol Treiber

188.    Plaintiff Carol Treiber is 67-years old and lives in Morris, New York.  A retired occupational nurse, she and her husband, James, have been married for 48 years and have two children and three grandchildren. Treiber retired in June 2011, but remains active as a volunteer provider of in-home hospice care and comfort for people who are in their final stage of life.

189.    In April 2011, Treiber needed to have several teeth removed from her lower mouth and, in replacement, a lower denture.  Treiber saw ADMI's advertisements offering a free exam and x-rays, as well as those promising, among other things, a new smile and "to treat our patients with respect and compassion" – like the commercial depicting a woman who is too humiliated to smile as well as a man in pain due to ill-fitting dentures.[23]  These advertisments, in combination with the fact that ADMI accepts Treiber's Delta Dental insurance plan, prompted Treiber to visit the local ADMI office in New Hartford, New York.

190.    Upon her arrival at the ADMI Local Office in New Hartford, New York, which ADMI represented was owned, operated and controlled by Judge Dental, PLLC

---

[23] http://www.aspendental.com/about/tv.

(*see supra*), Treiber was given a brief dental exam and then immediately whisked into the business office by an ADMI Office Manager.  The Office Manager persuaded Treiber to commit to a treatment plan that included full extractions and upper and lower dentures.

191.    Treiber's insurance would not cover the entire cost of treatment – almost $2,700.00 – so in accordance with ADMI protocol, the Office Manager encouraged Treiber to take out a CareCredit card to pay the remaining balance.  After the Office Manager delivered the CareCredit script, Treiber was issued a CareCredit card.  Treiber's insurance was then maxed out and her new CareCredit card was charged in full before any procedures were performed.

192.    In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Treiber that ADMI's Local Office in New Hartford is lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.  In fact, however, as Defendants fail to disclose, the New Hartford Local Office is neither lawfully licensed nor authorized to practice dentistry because, at all relevant times, the New Hartford Local Office has been, *inter alia*:

a.    unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the New Hartford Local Office, but by Defendants, who are not dentists and who own the New Hartford Local Office solely for their own financial benefit while designating dentists as sham "owners";

b.    nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

c.    engaging in unlawful fee-splitting with Defendants, who are not dentists.

**Leslie Talman**

193.    Plaintiff Leslie Talman resides in West Haven, Connecticut.  She is 53-years old and works in the office equipment business.

194.    In December 2010, Talman needed to have several teeth removed and dentures prepared.  Talman saw ADMI's advertisements offering, *inter alia*, a free exam and x-rays.  These advertisements, in combination with the fact that ADMI accepts Talman's insurance plan, prompted Talman to visit the local ADMI office in Orange, Connecticut.

195.    Upon her arrival at the ADMI Local Office in Orange, Connecticut, which ADMI represented was owned, operated and controlled by Aspen Dental Associates of New England, P.C. (*see supra*), Talman was given a brief dental exam and then immediately whisked into the business office by an ADMI Office Manager.  The Office Manager persuaded Talman to commit to an extensive treatment plan.

196.    Talman's insurance would not cover the entire cost of treatment – approximately $3,400.00 – so ADMI billed Talman the out-of-pocket balance of approximately $1,400.00.  Talman's insurance was then maxed out and the remaining balance was billed before any procedures were performed.

197.    In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Talman that ADMI's Local Office in Orange is lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.  In fact, however, as Defendants fail to disclose, the Orange Local Office is neither lawfully licensed nor authorized to

practice dentistry because, at all relevant times, the Orange Local Office has been, *inter alia*:

     a.  unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the Orange Local Office, but by Defendants, who are not dentists and who own the New Hartford Local Office solely for their own financial benefit while designating dentists as sham "owners";

     b.  nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

     c.  engaging in unlawful fee-splitting with Defendants, who are not dentists.

**Lori Slauter**

198.    Plaintiff Lori Slauter is 37-years old and resides in Altoona, Pennsylvania. She and her husband, John, have been married for over 13 years and have two (2) young children.  Slauter is a Special Education Aide who works with elementary school students.

199.    In June 2010, Slauter saw ADMI's advertisements offering, *inter alia*, a free exam and x-rays.  These advertisements, as well as coupons for discounted treatment, prompted Slauter to visit the local ADMI office in Altoona, Pennsylvania.

200.    Upon her arrival at the ADMI Local Office in Altoona, Pennsylvania, which ADMI represented was owned, operated and controlled by Aspen Dental Associates of Western PA, P.C. (*see supra*), Slauter was given a brief dental exam and was immediately whisked into the business office by an ADMI Office Manager.  The Office Manager persuaded Slauter to commit to an extensive treatment plan that included extractions of eighteen (18) teeth and dentures.

201.    Slauter did not have dental insurance; therefore, the entire cost of treatment – approximately $4,200.00 – would have to be paid out-of-pocket.   In accordance with ADMI protocol, the Office Manager encouraged Slauter to take out a CareCredit card to pay the balance.   After the Office Manager delivered the CareCredit script, Slauter applied for a CareCredit card; however, she did not qualify, so ADMI had a CareCredit card issued to Slauter's mother.   The out-of-pocket balance was then charged in full to Slauter's mother's CareCredit card before any procedures were performed.   Slauter reimbursed her mother for the entire bill.

202.    In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Slauter that ADMI's Local Office in Altoona is lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.   In fact, however, as Defendants fail to disclose, the Altoona Local Office is neither lawfully licensed nor authorized to practice dentistry because, at all relevant times, the Altoona Local Office has been, *inter alia*:

a.   unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the Altoona Local Office, but by Defendants, who are not dentists and who own the Altoona Local Office solely for their own financial benefit while designating dentists as sham "owners";

b.   nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

c.   engaging in unlawful fee-splitting with Defendants, who are not dentists.

52

**Rodney Herring**

203.    Plaintiff Rodney Herring is 39-years old and lives in Bourbonnais, Illinois. Herring is married and work as a parts puller in a scrap yard.  He and his wife have two (2) school-aged children.

204.    In September 2010, Herring saw ADMI's advertisements offering, *inter alia*, a free exam and x-rays.  These advertisements, in combination with the fact that ADMI accepts Herring's dental insurance plan, prompted Herring to visit the local ADMI office in Bourbonnais, Illinois.

205.    Upon his arrival at the ADMI Local Office in Bourbonnais, Illinois, which ADMI represented was owned, operated and controlled by I.F. Hamati, D.D.S., P.C. (*see supra*), Herring was given a brief dental exam and then immediately whisked into the business office by an ADMI Office Manager.  The Office Manager persuaded Herring to commit to an extensive treatment plan.

206.    Herring's insurance would not cover the entire cost of treatment, so in accordance with ADMI protocol, the Office Manager encouraged Herring to take out a CareCredit card to pay the remaining balance – approximately $1,500.00.  Instead of taking out a CareCredit card, Herring borrowed from his credit union to pay the balance. Herring's insurance was then maxed out and the out-of-pocket balance was paid to ADMI in full before any procedures were performed.  To this day, Herring is still paying off what he borrowed from his credit union to cover the out-of-pocket balance.

207.    In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Herring that ADMI's Local Office in Bourbonnais is lawfully licensed and authorized to practice dentistry and, thus,

entitled to receive fees for dental services and products.  In fact, however, as Defendants fail to disclose, the Bourbonnais Local Office is neither lawfully licensed nor authorized to practice dentistry because, at all relevant times, the Bourbonnais Local Office has been, *inter alia*:

     a.  unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the Bourbonnais Local Office, but by Defendants, who are not dentists and who own the Bourbonnais Local Office solely for their own financial benefit while designating dentists as sham "owners";

     b.  nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

     c.  engaging in unlawful fee-splitting with Defendants, who are not dentists.

**Patricia Huddleston**

208.    Plaintiff Patricia Huddleston is 48-years old and resides in Rhodes, Michigan.  She has been married to her husband, Larry, for fifteen (15) years.

209.    In August 2010, Huddleston needed a filling replaced.  ADMI's advertisements offering, *inter alia*, free exams and x-rays, in combination with the fact that ADMI accepts Huddleston's dental insurance plan, prompted Huddleston to visit the local ADMI office in Bay City, Michigan.

210.    Upon her arrival at the ADMI Local Office in Bay City, Michigan, which ADMI represented was owned, operated and controlled by Aspen Dental of Michigan, P.C. (*see supra*), Huddleston was given a brief dental exam and then immediately whisked into the business office by an ADMI Office Manager.  The Office Manager persuaded Huddleston to commit to an extensive treatment plan.

211.   Huddleston's insurance would not cover the entire cost of treatment – approximately $6,538.00 – so in accordance with ADMI protocol, the Office Manager encouraged Huddleston to take out a CareCredit card to pay the remaining balance.  After the Office Manager delivered the CareCredit script, Huddleston was issued a CareCredit card.  Huddleston's insurance was then maxed out and her new CareCredit card was charged in full before any procedures were performed.

212.   In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Huddleston that ADMI's Local Office in Bay City is lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.   In fact, however, as Defendants fail to disclose, the Bay City Local Office is neither lawfully licensed nor authorized to practice dentistry because, at all relevant times, the Bay City Local Office has been, *inter alia*:

a.   unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the Bay City Local Office, but by Defendants, who are not dentists and who own the Bay City Local Office solely for their own financial benefit while designating dentists as sham "owners";

b.   nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

c.   engaging in unlawful fee-splitting with Defendants, who are not dentists.

55

**Carl Dorsey**

213.    Plaintiff Carl Dorsey resides in Swansea, Massachusetts.  He is 73-years old and works as a car salesman, earning approximately $200.00 per week.  Dorsey also receives Social Security.

214.    In April 2011, Dorsey needed to see a dentist to have four (4) broken top teeth pulled and replace them with upper dentures.  Dorsey saw ADMI's advertisements offering, *inter alia*, free exams and x-rays. These advertisements prompted Dorsey to visit the local ADMI office in Seekonk, Massachusetts.

215.    Upon his arrival at the ADMI Local Office in Seekonk, Massachusetts, which ADMI represented was owned, operated and controlled by Aspen Dental Associates of New England, P.C. (*see supra*), Dorsey was given a brief dental exam and then immediately whisked into the business office by an ADMI Office Manager.  The Office Manager persuaded Dorsey to commit to an extensive treatment plan.

216.    Dorsey did not have dental insurance; therefore, the entire cost of treatment – approximately $2,634.00 – would have to be paid out-of-pocket.   In accordance with ADMI protocol, the Office Manager encouraged Dorsey to take out a CareCredit card to pay the balance.  After the Office Manager delivered the CareCredit script, Dorsey was issued a CareCredit card.  The entire balance of the treatment plan was then applied to Dorsey's new CareCredit card before any procedures were performed.

217.    In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Dorsey that ADMI's Local Office in Seekonk, Massachusetts is lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.  In fact, however, as

Defendants fail to disclose, the Seekonk Local Office is neither lawfully licensed nor authorized to practice dentistry because, at all relevant times, the Seekonk Local Office has been, *inter alia*:

      a.  unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the Seekonk Local Office, but by Defendants, who are not dentists and who own the Seekonk Local Office solely for their own financial benefit while designating dentists as sham "owners";

      b.  nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

      c.  engaging in unlawful fee-splitting with Defendants, who are not dentists.

## Irene Evers

218.    Plaintiff Irene Evers is 43-years old and lives in North Judson, Indiana.

219.    In September 2011, Evers saw ADMI's advertisements offering, *inter alia*, free exams and x-rays. These advertisements, in combination with the fact that ADMI accepts Evers' dental insurance plan, prompted her to visit the local ADMI office in Valparaiso, Indiana.

220.    Upon her arrival at the ADMI Local Office in Valparaiso, Indiana, which ADMI represented was owned, operated and controlled by a licensed dentist, Evers was given a brief dental exam and then immediately whisked into the business office by an ADMI Office Manager.  The Office Manager persuaded Evers to commit to an extensive treatment plan that included full extractions and upper and lower dentures.

221.    Evers's insurance would not cover the entire cost of the treatment plan, so in accordance with ADMI protocol, the Office Manger encouraged Evers to take out a

CareCredit card to pay the remaining balance.  After the Office manager delivered the CareCredit script, Evers was issued a CareCredit card.  Evers insurance was then maxed out and her new CareCredit card was charged in full before any procedures were performed.

222.    In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Evers that ADMI's Local Office in Valparaiso is lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.  In fact, however, as Defendants fail to disclose, the  Valparaiso Local Office is neither lawfully licensed nor authorized to practice dentistry because, at all relevant times, the Valparaiso Local Office has been, *inter alia*:

    a.   unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the Valparaiso Local Office, but by Defendants, who are not dentists and who own the Valparaiso Local Office solely for their financial benefit while designating dentists as sham "owners";

    b.   nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

    c.   engaging in unlawful fee-splitting with Defendants, who are not dentists.

### Kathryn Hovland

223.    Kathryn Hovland resides in Milwaukee, Wisconsin.  She is 66-years old, married, and works full time as a diet clerk at Froedtert Hospital in Milwaukee.

224.    In March 2011, Hovland saw ADMI's advertisements offering, *inter alia*, free exams and x-rays. These advertisements, in combination with the fact that ADMI

accepts Hovland's dental insurance plan, prompted her to visit the local ADMI office in Brookfield, Wisconsin.

225.    Upon her arrival at the ADMI Local Office in Brookfield, Wisconsin, which ADMI represented was owned, operated and controlled by a licensed dentist, Hovland was given a brief dental exam and then immediately whisked into the business office by an ADMI Office Manager.  The Office Manager persuaded Hovland to commit to an extensive treatment plan that included extractions of all but six (6) teeth and dentures.

226.    Hovland's insurance would not cover the entire cost of treatment – almost $6,000.00 – so in accordance with ADMI protocol, the Office Manager encouraged Hovland to take out a CareCredit card to pay the remaining balance.  After the Office Manager delivered the CareCredit script, Hovland was issued a CareCredit card. Hovland's insurance was then maxed out and her new CareCredit card was charged in full before any procedures were performed.

227.    In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Hovland that ADMI's Local Office in Brookfield is lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.  In fact, as Defendants fail to disclose, ADMI's Local Office in Brookfield is neither lawfully licensed nor authorized to practice dentistry because, at all relevant times, the Brookfield Local Office has been, *inter alia*:

a.  unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the Brookfield Local

Office, but by Defendants, who are not dentists and who own the Brookfield Local Office solely for their own financial benefit while designating dentists as sham "owners";

b.   nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

c.   engaging in unlawful fee-splitting with Defendants, who are not dentists.

**Isabelle Reali**

228.   Isabelle Reali is 59-years old and resides in South Portland, Maine.  She is a Certified Nursing Assistant and works at Mercy Hospital in Portland, Maine.

229.   In July 2010, Reali saw ADMI's advertisements offering, *inter alia*, free exams and x-rays.  These advertisements, in combination with the fact that ADMI accepts Reali's dental insurance plan, prompted Reali to visit the local ADMI office in South Portland, Maine.

230.   Upon her arrival at the ADMI Local Office in South Portland, Maine, which ADMI represented was owned, operated and controlled by a licensed dentist, Reali was given a brief dental exam and then immediately whisked into the business office by an ADMI Office Manager.  The Office Manager persuaded Reali to commit to an extensive treatment plan that included full extractions and upper and lower dentures.

231.   Reali's insurance would not cover the entire cost of the treatment plan, so in accordance with ADMI protocol, the Office Manager encouraged Reali to take out a CareCredit card to pay the remaining balance.  After the Office Manager delivered the CareCredit script, Reali was issued a CareCredit card.  Reali's insurance was then maxed out and her new CareCredit card was charged in full before any procedures were performed.

232.   In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Reali that ADMI's Local Office in South Portland is lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.  In fact, however, as Defendants fail to disclose, the South Portland Local Office is neither lawfully licensed nor authorized to practice dentistry because, at all relevant times, the South Portland Local Office has been, *inter alia*:

a.   unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the South Portland Local Office, but by Defendants, who are not dentists and who own the South Portland Local Office solely for their own financial benefit while designating dentists as sham "owners";

b.   nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

c.   engaging in unlawful fee-splitting with Defendants, who are not dentists.

**Geraldine Langford**

233.   Plaintiff Geraldine Langford is 61-years old and resides in Paducah, Kentucky.  She is employed by a call center and, on average, handles 250 calls daily.

234.   In December 2010, Langford saw ADMI's advertisements offering, *inter alia*, free exams and x-rays. These advertisements, in combination with the fact that ADMI accepts Langford's dental insurance plan, prompted Langford to visit the local ADMI office in Paducah, Kentucky.

235.   Upon her arrival at the ADMI Local Office in Paducah, Kentucky, which ADMI represented was owned, operated and controlled by a licensed dentist, Langford

was given a brief dental exam and then immediately whisked into the business office by an ADMI Office Manager.   The Office Manager persuaded Langford to commit to an extensive treatment plan that included full extractions and upper and lower dentures.

236.    Langford's insurance would not cover the entire cost of treatment, so in accordance with ADMI protocol, the Office Manager encouraged Langford to take out a CareCredit card to pay the remaining balance.   After the Office Manager delivered the CareCredit script, Langford was issued a CareCredit card.   Langford's insurance was then maxed out and her new CareCredit card was charged in full before any procedures were performed.

237.    In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Langford that ADMI's Local Office in Paducah is lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.   In fact, however, as Defendants fail to disclose, the Paducah Local Office is neither lawfully licensed nor authorized to practice dentistry because, at all relevant times, the Paducah Local Office has been, *inter alia*:

a.   unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the Paducah Local Office, but by Defendants, who are not dentists and who own the Paducah Local Office solely for their own financial benefit while designating dentists as sham "owners";

b.   nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

c.   engaging in unlawful fee-splitting with Defendants, who are not dentists.

**Troy Fulwood**

238.    Plaintiff Troy Fulwood resides in Fort Myers, Florida.  He is 34-years old and works in the auto detailing business.

239.    In October 2009, Fulwood saw ADMI's advertisements offering, *inter alia*, free exams and x-rays.  These advertisements, in combination with the fact that ADMI accepts Fulwood's dental insurance plan, prompted him to visit the local ADMI office in Fort Myers – Cypress Woods, Florida.

240.    Upon his arrival at the ADMI Local Office in Fort Myers – Cypress Woods, Florida, which ADMI represented was owned, operated and controlled by a licensed dentist, Fulwood was given a brief dental exam and then immediately whisked into the business office by an ADMI Office Manager.  The Office Manager persuaded Fulwood to commit to an extensive treatment plan.

241.    Fulwood's insurance would not cover the entire cost of treatment – approximately $1,346.00 – so ADMI maxed out his insurance and charged the remaining balance to Fulwood's credit card before any procedures were performed.

242.    In ADMI's marketing and advertising materials, patient forms, and CEO Fontana's public statements, Defendants misrepresented to Fulwood that ADMI's Local Office in Fort Myers – Cypress Woods is lawfully licensed and authorized to practice dentistry and, thus, entitled to receive fees for dental services and products.  In fact, however, as Defendants fail to disclose, the Fort Myers – Cypress Woods Local Office is neither lawfully licensed nor authorized to practice dentistry because, at all relevant times, the Fort Myers – Cypress Woods Local Office has been, *inter alia*:

a.   unlawfully incorporated and owned, operated, and controlled, not by licensed dentists actively engaged in the practice of dentistry at the Fort Myers – Cypress Woods Local Office, but by Defendants, who are not dentists and who own the Fort Myers – Cypress Woods Local Office solely for their own financial benefit while designating dentists as sham "owners";

b.   nominally "owned" by dentists who do not actually practice dentistry through the professional corporation; and

c.   engaging in unlawful fee-splitting with Defendants, who are not dentists.

**FIRST CLAIM**
**(Declaratory Judgment)**

243.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

244.   There is an actual case in controversy between Plaintiffs and members of the Class, on the one hand, and Defendants, on the other hand, regarding millions of dollars in payments for dental services and products that have been made by Plaintiffs and members of the Class to Defendants.

245.   Defendants have had, and continue to have, no right to receive payments for fees for dental services and products because the Local Offices are fraudulently incorporated and have been owned, operated, and controlled by persons not licensed to practice dentistry in 22 states, including New York.

246.   Defendants have had, and continue to have, no right to receive payments for fees for dental services and products because the Local Offices have been nominally "owned" by sham owner-dentists who do not, and have never, engaged in the practice of dentistry through the professional corporations they formed.

247.    Defendants have had, and continue to have, no right to receive payments for fees for dental services and products because the Local Offices are, and at all relevant times have been, engaged in unlawful fee-splitting with non-dentists.

248.    Defendants have had, and continue to have, no right to receive payments for fees for dental services and products because Defendants are, and at all relevant times have been, engaged in the unlawful corporate practice of dentistry.

249.    Thus, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, Plaintiffs and the members of the Class request a judgment declaring that:

a.    ADMI's Local Offices are not lawfully licensed and authorized to practice dentistry as they are, and at all relevant times have been, fraudulently incorporated and owned, operated, and controlled by Defendants, who are not dentists and not medical professionals, and thus, they are not entitled to receive payments for fees for dental services and products;

b.    ADMI's Local Offices are not lawfully licensed and authorized to practice dentistry as they are, and at all relevant times have been, nominally "owned" by sham owner-dentists who are not actively engaged in the practice of dentistry through the professional corporations they formed; and

c.    ADMI's Local Offices are not lawfully licensed and authorized to practice dentistry as they are, and at all relevant times have been, engaged in unlawful fee-splitting with non-dentists.

**SECOND CLAIM**
**(New York General Business Law §§ 349, 350)**

250.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

251.    GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]...."

252.    ADMI engages in consumer-oriented acts and practices through the sale and billing of dental services and products to consumers.

253.    ADMI's consumer-oriented acts were engaged in as a matter of routine practice at each ADMI Local Office.  As such, the acts and practices complained of herein are identical or substantially similar in effect with regard to each similarly situated consumer.

254.    ADMI materially misleads consumers, including Plaintiffs and members of the Subclass, by inducing them to purchase dental services and products through the unlawful corporate practice of medicine.

255.    The acts and practices complained of herein are likely to mislead a reasonable consumer acting reasonably under the circumstances.  Further, ADMI alone possessed material information of relevance to consumers which, as a matter of routine practice, it failed to provide to Plaintiffs and members of the Subclass.

256.    Plaintiffs and members of the Subclass were injured as a result of ADMI's deceptive acts and practices in the amount of all treatments purchased while subject to the unlawful conduct alleged herein.

257.    In addition, GBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

258.    ADMI targets consumers through advertisements and marketing materials that are widely disseminated in each state in which ADMI maintains Local Offices.

259.    ADMI's advertisements and marketing materials were, and continue to be, materially misleading.   Through its advertisements and marketing materials, ADMI purports that its Local Offices are authorized by law to provide dental care, when in fact, ADMI's Local Offices are illegally owned and operated.

260.    As a result of ADMI's advertisements and marketing materials, Plaintiffs and the members of the Subclass were lured to ADMI's Local Offices where they were injured in the amount of all treatments purchased while subject to the unlawful conduct alleged herein.

## THIRD CLAIM
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

261.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

262.    ADMI had a duty to exercise good faith and fair dealing when selling dental treatment plans to consumers, including Plaintiffs and the members of the Subclass.

263.    ADMI breached its duty of good faith and fair dealing by intentionally, purposefully, and/or negligently engaging in the conduct alleged herein, including the unlawful corporate practice of medicine.

264.    ADMI's conduct was conscious, deliberate, and unfairly frustrated the agreed upon purpose of the parties entering into and carrying out dental treatment plans.

265.    The conduct of ADMI deprived Plaintiffs and members of the Subclass the benefit of their bargain.

266.    As a direct and proximate result of ADMI's breach of good faith and fair dealing, Plaintiffs and members of the Subclass have and will continue to suffer damages.

**FOURTH CLAIM**
**(Unjust Enrichment)**

267.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

268.    As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Plaintiffs and the members of the Subclass.

269.    When Plaintiffs and the members of the Subclass paid ADMI, they reasonably believed that they were legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

270.    Defendants have been enriched at the expense of Plaintiffs and the members of the Subclass by virtue of the payments made by Plaintiffs and the members of the Subclass to which Defendants were not entitled, which constitute a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust scheme.

271.    Plaintiffs and the members of the Subclass made and continue to make payments to ADMI, which exists to receive these payments solely because of its fraudulent incorporation of the Local Offices.

272.    But for ADMI's fraudulent incorporation of the Local Offices, it would not have received, and continue to receive, fees from Plaintiffs and the members of the Subclass.

273.    Defendants' retention of the payments made by Plaintiffs and the members of the Subclass violates fundamental principles of justice, equity and good conscience.

274. By virtue of the foregoing, Defendants have been unjustly enriched in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

(a)   On the First Claim, awarding Plaintiffs and the Class a declaration, pursuant to 28 U.S.C. § 2201, that:

   1. ADMI's Local Offices are not lawfully licensed and authorized to practice dentistry as they are, and at all relevant times have been, fraudulently incorporated and owned, operated, and controlled by Defendants, who are not dentists and not medical professionals, and thus, they are not entitled to receive payments for fees for dental services and products;

   2. ADMI's Local Offices are not lawfully licensed and authorized to practice dentistry as they are, and at all relevant times have been, nominally "owned" by sham owner-dentists who are not actively engaged in the practice of dentistry through the professional corporations they formed; and

   3. ADMI's Local Offices are not lawfully licensed and authorized to practice dentistry as they are, and at all relevant times have been, engaged in unlawful fee-splitting with non-dentists.

(b)   On the Second Claim, awarding Plaintiffs and the Subclass actual damages, treble damages, and punitive damages, in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;;

(c)   On the Third Claim, awarding Plaintiffs and the Subclass compensatory damages in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(d)   On the Fourth Claim, awarding Plaintiffs and the Subclass compensatory damages in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

      (e)      Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as representatives of the Classes;

      (f)      Awarding Plaintiffs' counsel's reasonable attorneys' fees and costs; and

      (g)      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: New York, NY
      October 18, 2012

**NEWMAN FERRARA LLP**

By: __/s/ Jeffrey M. Norton____
Jeffrey M. Norton, Esq.
Bar No.: 303050
Randolph M. McLaughlin, Esq.
Bar No.: 303051
1250 Broadway, 27th Floor
New York, NY 10001
Telephone: (212) 619-5400
Facsimile: (212) 619-3090
Email: jnorton@nfllp.com
Email: rmclaughlin@nfllp.com

**COHEN LAW GROUP, P.C.**

By: ____/s/ Brian S. Cohen____
Brian S. Cohen, Esq.
Bar No.: 517182
10 East 40th Street – 46th Floor
New York, NY 10016
Telephone: (212) 967-2879
Facsimile: (646) 349-2567
Email: brian@cohenlg.com

      -and-

2 Greenwich Office Park – Suite 300
Greenwich, CT 06831
Telephone: (203) 485-7525
Facsimile: (203) 485-7526

*Counsel for the Plaintiffs and the Classes*